**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**REGINA M. LEO,**

**Plaintiff,**

**v.**

**AHMED S. J. AL NASER, MUNA S. M. N.
AL NAJADI, and STATE OF KUWAIT,**

**Defendants.**

Civil Action No. 08-1263 (RMU)

**Judge Ricardo M. Urbina**

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER
MOTION FOR RELIEF UPON RECONSIDERATION
OF THE COURT'S NOVEMBER 23, 2009 ORDER**</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS..........................................................................................2

LEGAL STANDARD ...............................................................................................3

ARGUMENT ..........................................................................................................4

I.      KUWAIT BEARS THE ULTIMATE BURDEN OF DEMONSTRATING THAT
        NONE OF THE EXCEPTIONS TO SOVEREIGN IMMUNITY SET FORTH IN
        THE FSIA APPLIES TO THIS CASE. ..........................................................8

II.     KUWAIT'S COMPLICIT AND INDISPENSIBLE INVOLVEMENT IN THE
        TRAFFICKING AND ABUSE OF MS. LEO CONSTITUTES AN IMPLIED
        WAIVER OF SOVEREIGN IMMUNITY UNDER THE FSIA. .................9

III.    THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS AGAINST
        KUWAIT BECAUSE HER CLAIMS ARE BASED UPON THE COMMERCIAL
        ACTIVITIES OF THE KUWAITI ATTACHÉ.............................................12

        A.      The Employment of a Domestic Worker is a "Commercial Activity" Under the
                FSIA.................................................................................................13

        B.      The Kuwaiti Attaché Was Acting In His Official Capacity as a Foreign Diplomat
                When He Trafficked, Employed, and Abused Ms. Leo.........................................15

IV.     THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS BECAUSE
        KUWAIT IS VICARIOUSLY LIABLE FOR THE KUWAITI ATTACHÉ'S
        TORTIOUS ACTIONS UNDER THE NON-COMMERCIAL TORT EXCEPTION
        TO THE FSIA. .....................................................................................16

        A.      Maryland Law, Not District Of Columbia or New York Law, Governs Plaintiff's
                Tort Claims. ......................................................................................18

        B.      Kuwait Is Vicariously Liable For the Individual Defendants' Tortious Conduct
                Because This Conduct Came Within The Scope Of the Kuwaiti Attaché's
                Employment........................................................................................19

V.      THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS BECAUSE
        KUWAIT RATIFIED THE INDIVIDUAL DEFENDANTS' TORTIOUS
        ACTIONS. ...........................................................................................23

VI.     THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS BECAUSE
        KUWAIT AIDED AND ABETTED THE TORTIOUS ACTIONS OF THE

INDIVIDUAL DEFENDANTS.......................................................................................24

 A. Kuwait is Liable for Aiding and Abetting the Individual Defendants' Violation of the TVPRA.............................................................................................................24

 B. Kuwait Aided and Abetted Individual Defendant's State Law Torts Arising From their Trafficking and Forced Labor.......................................................................26

VII. **KUWAIT'S KNOWING PARTICIPATION IN THE INDIVIDUAL DEFENDANTS' TORTIOUS ACTIONS AGAINST PLAINTIFF ARE NOT "DISCRETIONARY FUNCTIONS" THAT SHOULD BE PROTECTED BY IMMUNITY.**......................................................................................................27

VIII. **PLAINTIFF'S CLAIM OF FALSE IMPRISONMENT, AS WELL AS HER CLAIMS OTHER THAN FRAUD AND CONSTRUCTIVE FRAUD, COME WITHIN THE NON-COMMERCIAL TORT EXCEPTION TO IMMUNITY UNDER THE FSIA BECAUSE THESE CLAIMS DO NOT ARISE OUT OF DECEIT OR MISREPRESENTATION.**.......................................................................28

**CONCLUSION** ................................................................................................................30

## PRELIMINARY STATEMENT

In September 2005, Plaintiff Regina M. Leo ("Plaintiff," or "Ms. Leo") was trafficked to the United States and forced to work as a domestic slave for an attaché of the Kuwait Embassy in Washington, D.C., Brigadier General Ahmed S. J. Al Naser ("Mr. Al Naser" or the "Kuwaiti Attaché"), and his wife Muna S. M. N. Al Najadi ("Ms. Al Najadi") (collectively, the "Individual Defendants"). Plaintiff became a prisoner in the Individual Defendants' Maryland home, where she was forced to work up to nineteen hours per day, seven days per week, in isolation from the outside world. In addition to the forced labor she was required to perform, Plaintiff also was subjected to frequent physical and psychological abuse by the Individual Defendants, including repeated rapes by Mr. Al Naser.

Defendant the State of Kuwait ("Kuwait") was indispensably involved in these abuses, and played an essential role in furthering them. Indeed, Kuwait provided the necessary assistance, authorization, and support that made Plaintiff's trafficking and enslavement possible in the first place. Ms. Leo now seeks recovery from the Individual Defendants and Kuwait for the injuries she suffered as a result of her trafficking and forced labor. Yet, Kuwait contends that it enjoys immunity from all of Ms. Leo's claims pursuant to the Foreign Sovereign Immunities Act ("FSIA"), and that this Court therefore lacks personal and subject matter jurisdiction.

As detailed below, however, traditional principles of international human rights law and the statutory exceptions to immunity set forth in the FSIA conclusively establish jurisdiction over Kuwait, and mandate that Ms. Leo has her day in court against her abusers. Accordingly, Plaintiff respectfully requests that the Court reconsider its November 23, 2009 Order, and, for the reasons stated herein, deny Defendant the State of Kuwait's Motion to Dismiss in its entirety.

## STATEMENT OF FACTS

On or about September 29, 2005, the Individual Defendants trafficked Ms. Leo, an impoverished woman who grew up in an orphanage in rural India, from Kuwait to the United States and enslaved her in their home in Bethesda, Maryland.  Compl. ¶¶ 10-36. The Individual Defendants were only able to bring Ms. Leo to the United States because she had previously been issued an A-3 visa.  Compl. ¶ 14.  A-3 visas are exclusively reserved for diplomats wishing to bring their own foreign domestic staff into the United States during their assignment so that the diplomats can more effectively carry out their diplomatic functions.  Compl. ¶ 43.  To induce the United States government to issue the visa, the Individual Defendants, as a part of the application process, presented an employment contract to a U.S. Embassy official and represented to U.S. Embassy officials that they would provide Ms. Leo with employment terms and conditions compliant with United States law.  Compl. ¶ 14.  The Individual Defendants, however, never intended to carry out the representations made to Ms. Leo and the United States. Compl. ¶ 15.

Not only did Kuwait know of the Individual Defendant's trafficking activities, it played an indispensible role in enabling them.  Kuwait provided the necessary assistance, authorization, and support that made Plaintiff's trafficking and enslavement possible.  The sole basis for the United States' issuance of a visa to Plaintiff was Kuwait's employment of Mr. Al Naser.  Compl. ¶ 14.  In support of the Individual Defendants' application for Plaintiff's visa, Kuwait authorized the applications and submitted documentation to the United States, including a "diplomatic note" verifying the Kuwaiti Attaché's status as a diplomat.  Kuwait assisted the Individual Defendants in obtaining Plaintiff's visa knowing of the misrepresentations made by the Individual Defendants to Plaintiff and U.S. Embassy officials.  Based on the signed employment contract,

the Individual Defendants' representations and Kuwait's authorization and support of the

Individual Defendants' visa application for Plaintiff, the United States subsequently issued a visa

to Plaintiff permitting her to travel to the United States to work as a live-in domestic employee

for the Individual Defendants.  Compl. ¶ 14.

       In September 2005, Plaintiff entered the United States using her A-3 visa.   Compl. ¶ 16.

Upon arrival, Individual Defendants confiscated Plaintiff's passport and visa.  Compl. ¶ 22.

Individual Defendants, with the assistance of Kuwait, thereafter enslaved Plaintiff, imprisoned

her and subjected her to severe psychological, physical, and sexual abuse at Individual

Defendants' Maryland home.  Compl. ¶¶ 18-39.  On May 5, 2006, Plaintiff escaped  the

Individual Defendants' home  with the assistance of a neighbor's housekeeper, Ayuda, Inc., and

the police.  Compl. ¶ 40-42.

## <u>LEGAL STANDARD</u>

       A court may dismiss a claim for lack of jurisdiction only if "'it appears beyond doubt that

the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief.'"

*Richardson v. United States*, 193 F.3d 545, 549 (D.C. Cir. 1999) (*quoting Caribbean Broad.*

*Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir. 1998)) (emphasis added).

Where a court's subject matter jurisdiction is called into question, the court may consider matters

outside the pleadings to ensure it has power over the case. *Teva Pharm., USA, Inc. v. U.S. Food*

*& Drug Admin*., 182 F.3d 1003, 1008 (D.C. Cir. 1999).  In evaluating a motion to dismiss for

lack of jurisdiction, a court must first determine whether a defendant challenges the legal

sufficiency or the factual basis of the court's jurisdiction.  *Kilburn v. Socialist People's Libyan*

*Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004).  Where, as here, "the defendant

challenges only the legal sufficiency of the plaintiff's jurisdictional allegations,  [ ] the district

court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the [FSIA] exceptions to immunity invoked by the plaintiff." [1]  *Id*; *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).

## ARGUMENT

The condemnation of slavery as a crime against humanity has been universally recognized, as evidenced by the multiple and comprehensive human rights treaties that have sought to prohibit the slave trade, including the Universal Declaration of Human Rights; the International Covenant on Civil and Political Rights; the European Convention for the Protection of Human Rights and Fundamental Freedoms; and the American Convention on Human Rights. Yet, despite these collective efforts to rid the world of slavery, the United Nations has declared that "slavery and slavery-like practices continue to be among the greatest human rights challenges facing the international community."  United Nations Press Release, Human Rights and United Nations Officials Appeal for More Solidarity with the Victims of Contemporary Forms of Slavery (Dec. 1, 2003), *available at* http://www.unhchr.ch/huricane/huricane.nsf/ view01/F354637419971687C1256DEF003C95E5?opendocument.

In an effort to curb the proliferation of slavery-like practices around the world, the United States enacted in 2000 the Trafficking and Violence Protection Act ("TVPA").  Under the TVPA, the Secretary of State is instructed to submit an annual Trafficking in Persons Report (the "TIP Report").  The annual TIP Report ranks foreign countries into tiers based on the extent of government action to combat trafficking, and "serves as the primary diplomatic tool through which the U.S. Government encourages other countries to help fight all forms of modern slavery,

---

[1]  Nothing in Kuwait's brief suggests that it is challenging the factual basis for this Court's jurisdiction.  However, should Kuwait assert for the first time in its reply that it challenges Plaintiff's well-pleaded factual allegations, the Court should permit Ms. Leo jurisdictional discovery such that she has "ample opportunity to secure and present evidence relevant to the existence of jurisdiction."  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

including forced labor . . . [and] involuntary domestic servitude. . . ."  *See* Trafficking in Persons Report, http://www.state.gov/g/tip/rls/tiprpt/.  The 2010 TIP Report included, for the first time, an evaluation and ranking of the United States' efforts to combat trafficking and eradicate modern forms of slavery on its own soil.  While the decision to include the United States in the 2010 TIP Report was widely lauded by the international human rights community, one aspect of the Report's treatment of the United States has come under scrutiny.  The report did not comply with a 2008 congressional mandate to identify specific countries whose diplomats allegedly harbor and traffic domestic slaves in the United States.  *See* E. Benjamin Skinner, *Modern-Day Slavery on D.C.'s Embassy Row?*, TIME Magazine (June 14, 2010), *available at* http://www.time.com/time/nation/article/0,8599,1996402,00.html (attached as Exhibit A).

The 2008 congressional mandate was prompted by mounting evidence of the very types of human rights abuses perpetrated by Kuwait and the Individual Defendants in this case.  For example, in 2001, Human Rights Watch ("HRW") issued a report entitled HIDDEN IN THE HOME: ABUSE OF DOMESTIC WORKERS WITH SPECIAL VISAS IN THE UNITED STATES.[2]  The report chronicled the extensive abuse of domestic workers who were trafficked to the United States in the 1990s by foreign diplomats.  The abuses detailed in the report included physical assault and battery, restrictions on the workers' freedom of movement, withholding of the workers' passports, denial of medical treatment, invasions of privacy, psychological abuse, and forced labor.  In 2008, the Government Accountability Office (the "GAO") issued a report to the Senate Subcommittee on Human Rights and the Law.[3]  The report documented 42 domestic workers in the United States on diplomatic A-3 and G-5 visas who alleged abuse at the hands of their diplomat employers since 2000.  The alleged abuses included physical and verbal abuse, wage

---

[2]The report is attached as Exhibit B, and is also available at http://www.hrw.org/reports/2001/usadom/.

[3] The report is attached as Exhibit C, and is also available at http://www.gao.gov/new.items/d08892.pdf.

and hour violations, and human trafficking.  The report further noted that "[t]he total number of alleged incidents of household employee abuse by foreign diplomats with some level of immunity *is likely to exceed the total we have identified . . . .*"  *See* Exhibit C, p. 13 (emphasis added).  Both the HRW and GAO reports also specifically referenced the growing number of complaints and lawsuits being brought by domestic workers against their diplomatic employers, and the consistent allegations of physical abuse, forced labor, denial of wages, and human trafficking.

Despite this abundant evidence of widespread abuse, foreign countries and their diplomats, such as the Defendants in this case, continue to traffic and abuse domestic slaves with impunity by claiming the protections of sovereign and diplomatic immunity.  As the GAO concluded in its 2008 report, these claimed immunities greatly constrain the victims' ability to secure any kind of relief.  For example, assertions of immunity complicate law enforcement agencies' ability to investigate alleged abuses.  Likewise, some courts have upheld both foreign countries' and individual diplomats' claims of immunity, and have dismissed victims' lawsuits seeking relief for their alleged abuses.  Thus, while the abuse of domestic slaves has gained traction as a political issue, there has been virtually no deterrent effect on the actual abuses inflicted by foreign countries and their diplomats.  Put simply, the perpetrators of such abuse have no reason to stop when their actions are cloaked in immunity.  Moreover, when immunity for these abuses is upheld, the victims have no recourse or relief under the law.  They are merely left with the scars of unhindered abuse, torture, and forced labor.

This is precisely the outcome Kuwait would have the Court reach in this case.  Ms. Leo was subjected to horrific abuses at the hands of the Individual Defendants, including being forced to work up to nineteen hours per day, seven days per week, in isolation from the outside

world; frequent physical and psychological abuse; and repeated rapes by Mr. Al Naser.  Kuwait

was complicit in these abuses, and played an indispensible role in furthering them.[4]  Yet Kuwait

now contends that it enjoys immunity from all of Plaintiff's claims pursuant to the FSIA, and

asks this Court to shield it from any liability for the abuses inflicted on Ms. Leo (abuses that the

Defendants, including Kuwait, have yet to deny).  That foreign countries and their diplomats,

such as Kuwait and the Kuwaiti Attaché, are able to engage in modern-day slavery, within miles

of the place where slavery was abolished in this country nearly 150 years ago, is an abomination.

To allow them to do so under the cover of sovereign and diplomatic immunity, however, is an

egregious miscarriage of justice that cannot be sanctioned by this Court.

      As discussed further below, Kuwait's claims of immunity under the FSIA are without

merit.  Kuwait's arguments misconstrue the scope of immunity granted by the FSIA, ignore the

burden of proof it must carry, and wholly disregard the well-pled allegations set forth in

Plaintiff's complaint.  Plaintiff  has asserted ten counts against Kuwait to recover damages for

the injuries she incurred as a result of the trafficking and forced labor to which she was

subjected.  Plaintiff's complaint contains detailed allegations in support of each count which

chronicle Kuwait's involvement in, and ratification of, these tortious activities.  When taken as

true, as they must be at this phase of the litigation, these allegations indisputably establish the

basis for this Court's jurisdiction under the FSIA.  Accordingly, upon reconsideration of the

Court's November 23, 2009 Order, Kuwait's Motion to Dismiss should be denied in its entirety.

---

[4] Kuwait's complicit involvement in the trafficking and abuse of Ms. Leo should come as no surprise.  Since 2007, Kuwait has been designated a Tier 3 country (i.e., "[c]ountries whose governments do not fully comply with the [TVPA's] minimum standards [for the elimination of trafficking] and are not making significant efforts to do so").  *See, e.g.,* 2010 Trafficking in Persons Report, p. 23, available at http://www.state.gov/documents/ organization/142979.pdf.  Specifically, the 2010 TIP Report noted that "[t]he government remains reluctant to prosecute Kuwaiti citizens for trafficking-related offenses; much of the human trafficking found in Kuwait involves domestic workers in Kuwaiti private residences."  *Id.* at p. 204.

I.      **KUWAIT BEARS THE ULTIMATE BURDEN OF DEMONSTRATING THAT NONE OF THE EXCEPTIONS TO SOVEREIGN IMMUNITY SET FORTH IN THE FSIA APPLIES TO THIS CASE.**

The purpose of the FSIA is to facilitate legal actions arising from activity of sovereigns in United States courts. *Transamerican S.S. v. Somali Democratic Republic*, 767 F.2d 998, 1001 (D.C. Cir. 1985). The FSIA achieves this purpose by establishing a basis for subject matter and personal jurisdiction over foreign sovereigns. *See Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). While the FSIA provides for immunity from suit for certain persons engaged in certain activities, this immunity is hardly absolute, limited as it is by a number of statutory exceptions. *See* 28 U.S.C. §§ 1605-1607. As one court has recognized, "the primary purpose of [the FSIA] is to *'restrict'* the immunity of a foreign state to suits involving a foreign state's public acts." *Tex. Trading & Milling Corp. v. Fed. Republic of Nig.*, 647 F.2d 300, 308 (2d Cir. 1981) (emphasis added).

Importantly, the FSIA places the ultimate burden on the *defendant foreign state* to demonstrate that it is entitled to sovereign immunity under the statute. *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994). Thus, when a plaintiff has adequately pled factual allegations that establish the applicability of a statutory exception to sovereign immunity, as Plaintiff has in this case, the defendant foreign state carries the ultimate burden of persuading the Court that it is still entitled to immunity. *See Transamerican Steamship*, 767 F.2d at 1002 ("[the] burden of proof in establishing the inapplicability of these exceptions is upon the party claiming immunity"). If an exception to the FSIA has been adequately pled, and the defendant does not meet its burden of persuasion, the foreign state's sovereign immunity is abrogated and it is subject to suit. *See generally Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Allen v. Russian Fed'n*, 522 F. Supp. 2d

167, 181 (D.D.C. 2007).[5]  As discussed further below, Kuwait has failed to meet its burden with respect to three exceptions to the FSIA: (1) the implied waiver exception, (2) the commercial activity exception, and (3) the non-commercial tort exception.  Accordingly, Kuwait is not entitled to immunity, and its Motion to Dismiss should be denied in its entirety.

## II.   KUWAIT'S COMPLICIT AND INDISPENSIBLE INVOLVEMENT IN THE TRAFFICKING AND ABUSE OF MS. LEO CONSTITUTES AN IMPLIED WAIVER OF SOVEREIGN IMMUNITY UNDER THE FSIA.

The FSIA provides that a foreign state shall *not* be entitled to sovereign immunity in any case in which the state "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).  As Judge Wald forcefully argued in her dissenting opinion in *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), this exception to the FSIA applies, and a foreign state implicitly waives its sovereign immunity, when it "violat[es] the *jus cogens* norms of international law condemning enslavement . . . ."  *Princz*, 26 F.3d at 1179 (Wald, J. dissenting); *see also* Adam C. Belsky, Mark Merva, & Naomi Roht-Arriaza, *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law*, 77 Cal. L. Rev. 365 (1989).

A *jus cogens* norm is a peremptory norm of international law that is "accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent  norm of general international law having the same character." *Id*. at 1180 (*quoting* Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 332).  As Judge Wald noted, "[o]ne need

---

[5]  Kuwait's curious attempt to argue that this Court lacks subject matter jurisdiction because it is not Ms. Leo's "principal target" fails. First, Kuwait cites no law in support of this contention.  Second, it is unclear how the concept of a primary target relates to this Court's exercise of subject matter jurisdiction.  Finally, as set forth in this brief, subject matter jurisdiction exists because FSIA's commercial activity and non-commercial tort exceptions apply and bar any immunity Kuwait is trying to assert.

not pause long before concluding that the international community's denunciation of both genocide and slavery are accepted norms of customary international law and, in particular, are *jus cogens* norms." *Id.* Thus, in *Princz*, Judge Wald concluded that "Germany waived its sovereign immunity [under the FSIA] by violating the *jus cogens* norms of international law condemning enslavement and genocide." *Id*. at 1179.

In the same way, Kuwait's complicit and indispensable involvement in the trafficking and abuse of Ms. Leo constitutes a violation of the *jus cogens* norm of international law condemning slavery. *See, e.g.,* Tom Obokata, *Human Trafficking, Human Rights and Nationality, Immigration and Asylum Act 2002*, 4 Eur. Hum. Rts. L. Rev. 410, 414 (2003) ("Prohibition of slavery is also part of customary international law and constitutes *jus cogens*"); A. Yasmine Rassam, *International Law and Contemporary Forms of Slavery: An Economic and Social Rights-Based Approach*, 23 Penn St. Int'l. L. Rev. 809, n14 (2005) ("The prohibition of slavery . . . is a preemptory norm of customary international law and *jus cogens* as well as a crime against humanity").  Kuwait has also violated the *jus cogens* against slavery through its demonstrated pattern of complacency and disregard for the human rights of household employees, even when confronted with evidence of abuse and domestic slavery.

As early as 1996, Kuwait received a memorandum from the United States Department of State (the "State Department") explaining that it was concerned to learn that members of the diplomatic and consular community had paid their personal household employees substantially less than those stipulated at the time of employment, withheld their employees' passports, required employees to work for additional hours with no additional pay, and forbade employees from leaving the employer's premises even when off duty.  *See* Compl. ¶ 45.  The State Department further informed Kuwait that it should take affirmative steps to monitor its

employees, including reviewing employment contracts to ensure that diplomats respect their

obligations as employers.  *See* Compl. ¶ 46.  The letter went on to explain that the State

Department would hold the "Chief of Mission and the sending government responsible for the

conduct of persons sent to the United States as diplomatic representatives or of others entitled to

immunity." *See* Compl. ¶ 47.  On June 19, 2000, the State Department sent yet another letter to

Kuwait reminding them of diplomats' legal obligations to their employee domestic workers.  *See*

Compl. ¶ 49.  Notwithstanding these letters, the Kuwait government has made no efforts to

monitor the working relationships of its diplomats or to protect the well being of their household

employees, as evidenced most clearly by the horrific abuse and enslavement of Ms. Leo by the

Individual Defendants.

Plaintiff acknowledges that, in *Hwang Geum Joo v. Japan*, 332 F.3d 679, 687 (D.C. Cir.

2003), the appellants similarly argued that the nation of Japan had "impliedly waived its

sovereign immunity by violating *jus cogens* norms against sexual trafficking." Although it

expressed sympathy "for the plight of the appellants," the court ultimately concluded that "a

violation of *jus cogens* norms does not constitute an implied waiver of sovereign immunity under

the FSIA." *Id*.  Since the *Hwang Geum Joo* decision was issued, however, commentators and

academics have continued to encourage courts to follow Judge Wald's interpretation of the

implied waiver provision of the FSIA.  *See, e.g.,* Krista Friedrich, *Statutes of Liberty? Seeking*

*Justice Under United States Law When Diplomats Traffic in Persons*, 72 Brooklyn L. Rev. 1139,

1171 (2007);  Adam Day, *Crimes Against Humanity as a Nexus of Individual and State*

*Responsibility: Why the ICJ Got Belgium v. Congo Wrong*, 22 Berkeley J. Int'l L. 489 (2004);

Judge Edward D. Re, *The Universal Declaration of Human Rights: Effective Remedies and the*

*Domestic Courts*, 33 Cal. W. Int'l L.J. 137 (2003).  Likewise, since the *Hwang Geum Joo*

decision, courts from foreign jurisdictions have also increasingly declined to confer immunity when a sovereign entity violates *jus cogens* norms. *See, e.g., Ferrini v. Repubblica Federale di Germania, Cass.*, sez. un., 11 mar. 2004, no. 5044, 87 Rivista Di Diritto Internazionale 539 (2004) (English translation available at 128 I.L.R. 658 (2004)) (holding that a foreign state cannot enjoy immunity with respect to sovereign acts that can be classified as "international crimes."); *Prefecture of Voiotia v. Fed. Republic of Germany*, No. 11/2000 (Areios Pagos [Hellenic Sup. Ct.] May 4, 2000).

In light of these growing calls for foreign sovereigns to be held accountable for violations of *jus cogens* norms, and based on the horrific allegations of abuse in this case, Plaintiff contends that the factual circumstances *in this case* merit a finding that Kuwait, by its indispensable involvement in the trafficking and abuse of Ms. Leo, has implicitly waived its sovereign immunity under the FSIA. Accordingly, this Court has jurisdiction over Plaintiff's claims, and Kuwait's Motion to Dismiss should be denied.

## III.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS AGAINST KUWAIT BECAUSE HER CLAIMS ARE BASED UPON THE COMMERCIAL ACTIVITIES OF THE KUWAITI ATTACHÉ.

The FSIA also provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state . . . ." 28 U.S.C. § 1605(a)(2). Under the FSIA, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). In other words, the question of whether a sovereign engages in commercial activity hinges upon whether the foreign state was acting "in the manner of a private player within the market," rather than exercising powers "peculiar to

sovereigns." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993); *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) (finding that a foreign sovereign engaged in commercial activity when it loaned art to museums in United States because a loan is the type of activity a private person can perform). If the foreign state acted "in the manner of a private player within the market," then it is not immune from suit for alleged wrongs stemming from those actions. *Nelson*, 507 U.S. at 360.

Of critical importance to this case, the FSIA expressly defines "foreign state" to include agencies and instrumentalities of the foreign state for the purposes of abrogating immunity. *See* 28 U.S.C. § 1603. Indeed, courts have recognized that liability for the acts of a foreign state's agencies and instrumentalities is readily imputed to the foreign state. *See Transamerican Steamship,* 767 F.2d at 1002 (determining that jurisdiction under the FSIA lies against a foreign state because the foreign state's instrumentality engaged in commercial activity). Thus, when acting in the course of their official duties, individuals employed by a foreign state are considered to be agencies or instrumentalities of a foreign state. This Court possesses jurisdiction over Plaintiff's claims against Kuwait so long as the Kuwaiti Attaché's employment of Plaintiff was a "commercial activity" undertaken within the scope of his official duties.

A.   The Employment of a Domestic Worker is a "Commercial Activity" Under the FSIA.

Kuwait does not dispute that Mr. Al Naser's employment of Plaintiff constituted a "commercial activity." *See* Def.'s Mot. to Dismiss (Dkt. # 12-1) ("Def.'s Br."), p. 4 ("the act and manner of employing Leo as a housekeeper was . . . the commercial conduct or commercial transaction or act of the Individual Defendants"). Nor could it. Court have consistently recognized that employment of a non-civil servant, such as Ms. Leo, qualifies as "commercial activity" under the FSIA. *See, e.g., Nelson,* 507 U.S. at 360; *El-Hadad v. U.A.E.*, 496 F.3d 658,

664 (D.C. Cir. 2007) (finding that employment is a "commercial activity" and that defendant sovereign was therefore not immune to suit); *Zveiter v. Brazilian Nat'l Superintendency of Merck Marine*, 833 F.Supp. 1089, 1093 (S.D.N.Y. 1993) (noting that hiring a secretary is the type of activity that a member of the public undertakes).  Indeed, the FSIA's legislative history specifically concludes that hiring domestic help is not a uniquely sovereign activity and that "employment . . . of laborers . . . would be among those included within the definition [of commercial activity]."  H.R.Rep. 94-1487, at 16 (1976).

Instead, Kuwait contends that the commercial activity exception does not apply to its claims for immunity under the FSIA because Plaintiff has not "established that *Kuwait* engaged in any commercial activity with respect to Leo."  Def.'s Br., p. 4 (emphasis added).  Kuwait's contention is incorrect for two reasons.  First, Kuwait's argument wholly ignores Plaintiff's detailed allegations that *do* establish Kuwait's involvement in the commercial activities that gave rise to Plaintiff's injuries (e.g., Kuwait's necessary involvement in procuring Ms. Leo's A-3 visa).  Second, Kuwait's argument is inconsistent with the case law in this circuit.  Kuwait relies on *Swarna v. Al-Awadi, et al.*, 607 F. Supp. 2d 509 (S.D.N.Y. 2010) for its contention that Plaintiff must establish that "Kuwait engaged in [a] commercial activity with respect to Leo." Def.'s Br., p. 4.  But Kuwait's reliance on this case is misplaced.  As an initial matter, the decision of a court sitting in the Southern District of New York is not binding precedent on this Court.  More importantly, however, the court in *Swarna* held only that the commercial activity exception did not apply because the plaintiff had not adequately alleged that the foreign state *itself* had engaged in a commercial activity.  *See Swarna*, 607 F. Supp. 2d at 525.  The *Swarna* court did not address whether the defendant diplomats' employment and abuse of the plaintiff could be imputed to the foreign state.  Nor did the *Swarna* court (or Kuwait, for that matter)

14

address *Transamerican S.S. v. Somali Democratic Republic*, 767 F.2d 998, 1001 (D.C. Cir. 1985), a case that *is* binding precedent on this Court.  In that case, the D.C. Circuit expressly held that a foreign state's immunity under the FSIA *can* be abrogated based on the commercial activities of the foreign state's agents or instrumentalities.  *See Transamerican Steamship,* 767 F.2d at 1002 (reversing district court's dismissal of claims against foreign state for lack of jurisdiction under the FSIA).  As discussed below, Mr. Al Naser's employment of Plaintiff was a "commercial activity" undertaken within the scope of his official capacity as a representative of Kuwait.  Accordingly, even if Plaintiff had not alleged any commercial activities directly undertaken by Kuwait, liability for Plaintiff's injuries arising out of her employment by the Kuwaiti Attaché may be imputed to Kuwait, as long as the Kuwaiti Attaché was acting in his official capacity when her injuries were sustained.

> **B.**     The Kuwaiti Attaché Was Acting In His Official Capacity as a Foreign Diplomat When He Trafficked, Employed, and Abused Ms. Leo.

To determine whether an individual acts in an official capacity, a court must focus on the nature of the individual's alleged actions, rather than the alleged motives underlying them, as well as whether the individual purports to act as an individual and whether the individual's actions were authorized by the state.  *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997) (*citing Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106-07 (9th Cir. 1990)).  Ms. Leo has alleged facts that unquestionably demonstrate that Mr. Al Naser was acting in his official capacity when he trafficked, employed, and abused her.  For example, the Individual Defendants brought Ms. Leo to the United States pursuant to an A-3 visa.  This type of visa is available exclusively to representatives of foreign governments, and allows them to bring private servants for employment in their homes during their diplomatic assignments.  Compl. ¶ 14.  Diplomats are provided this privilege to facilitate the performance of

15

their diplomatic functions.  Compl. ¶ 43.  Thus, absent the Kuwaiti Attaché's official capacity as a representative of Kuwait, the Individual Defendants could not have brought Ms. Leo into the United States to work in their home.  Compl. at ¶ 14.  Moreover, that Kuwait had to authorize Mr. Al Naser's employment of Ms. Leo further bolsters the fact that those actions fell within the scope of his official duties as a diplomatic representative of Kuwait.  Kuwait had to authorize Ms. Leo's visa application, and submitted documentation to the United States in support of the application.

Regardless of the Individual Defendants' motive for employing Plaintiff, Mr. Al Naser's hiring of Ms. Leo as a domestic worker in the United States was an act he could perform only as a Kuwaiti official and only because Kuwait explicitly and specifically authorized her employment.  *See Jungquist*, 115 F.3d at 1028; *Chuidian*, 912 F.2d at 1106-07.  Thus, the Kuwaiti Attaché, at all times material, was acting in his official capacity as a representative of Kuwait in employing Ms. Leo.[6]  Consequently, the commercial activity exception to foreign sovereign immunity applies, and this Court has jurisdiction over Plaintiff's claims because they are all based on a commercial activity engaged in by an agent of Kuwait acting in his official capacity as a Kuwaiti diplomat.

## IV.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS BECAUSE KUWAIT IS VICARIOUSLY LIABLE FOR THE KUWAITI ATTACHÉ'S TORTIOUS ACTIONS UNDER THE NON-COMMERCIAL TORT EXCEPTION TO THE FSIA.

The FSIA's non-commercial tort exception to foreign sovereign immunity allows

---

[6]  Plaintiff does not plead the Individual Defendants' and Kuwait's liability in the alternative.  Instead, Plaintiff maintains that the Individual Defendants hired Plaintiff in their official capacity (and thus their acts are imputable to Kuwait), but that their conduct toward Plaintiff was not incidental to being diplomats (and thus they are not entitled to diplomatic immunity).  As *Jungquist*, 115 F.3d at 1028 and *Chuidian*, 912 F.2d at 1106-07, make clear, because a diplomat employs a domestic worker in his official capacity for purposes of the FSIA does not mean that the employment relationship is an official function for purposes of the Vienna Convention, because distinct analyses are required.

jurisdiction over a foreign state in any case "in which money damages are sought against a foreign state for personal injury . . . occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting in the scope of his office or employment . . . ."  28 U.S.C. §1605 (a)(5).  This Court also has jurisdiction over Plaintiff's claims because they constitute torts that were committed by the Individual Defendants while they were acting within the scope of their office or employment.[7]  *See* 28 U.S.C. §1605(a)(5).  Alternatively, even if this Court were to find that the Kuwaiti Attaché was acting outside the scope of his employment at the time he committed the alleged torts, Kuwait remains liable because of its subsequent ratification of his unlawful conduct.  Kuwait is also responsible for Defendant Al Najadi's participation in these tortious acts because its employee, the Kuwaiti Attaché, approved of and directed her actions, and because the Individual Defendants acted in concert in perpetrating them.

Kuwait contends that it is immune from suit because it is not vicariously liable for Mr. Al Naser's tortious acts.  Kuwait contends that when Mr. Al Naser committed the tortious acts, he acted outside the scope of his office or employment and, since it does not employ Defendant Al Najadi, it cannot be held responsible for her actions.  *See* Def's Br. at 6-10.  On the contrary, Kuwait may be held vicariously liable for the Individual Defendants' tortious acts, including their trafficking and forced labor in violation of the Trafficking Victims Protection Reauthorization Act, ("TVPRA"), 18 U.S.C. § 1590 *et seq.*; involuntary servitude in violation of the Thirteenth Amendment; false imprisonment; intentional and negligent infliction of emotional distress; battery; and civil conspiracy.

---

[7] The Court has jurisdiction over all of Plaintiff's claims other than fraud and constructive fraud pursuant to the non-commercial tort exception to FSIA immunity.

A.      Maryland Law, Not District Of Columbia or New York Law, Governs Plaintiff's
        Tort Claims.

In assessing whether Kuwait may be held vicariously liable for Individual Defendants'

tortious conduct, it is the law of *respondeat superior* from the state in which the tortious conduct

occurred that must be applied.   Yet in its Motion, Kuwait repeatedly cites authorities applying

District of Columbia law and New York law, making only the conclusory (and incorrect)

assertion that the Maryland law of *respondeat superior* is "nearly identical" to that of the other

jurisdictions.   Def's Br. at 7-9.   To the contrary, Maryland law regarding the doctrine of

*respondeat superior* is materially different from the precedent cited by Kuwait.

The FSIA non-commercial tort exception provides that a foreign state shall not be

immune as to claims "caused by the tortious act or omission . . . of any official or employee of

that foreign state while acting within the scope of his office or employment."   28 U.S.C. § 1605

(a)(5).   To determine whether an employee is acting within the scope of his employment to fall

within the non-commercial tort exception, a Court must look to the applicable state law on

*respondeat superior*.[8]   *First Nat'l City Bank v. Banco Para El Camerio Exterior de Cuba*, 462

U.S. 611, 622 n11 (1983); *Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 63 (D.D.C.

2007); *Guzel v. State of Kuwait*, 818 F. Supp. 6, 10 (D.D.C. 1993); *Skeen v. Federative Republic

of Brazil*, 566 F. Supp. 1414, 1417 (D.D.C. 1983).

As this Court sits in the District of Columbia, it must apply District of Columbia choice

of law provisions to determine which state law to apply.   *Steele v. Isikoff*, 130 F. Supp. 2d 23, 30

(D.D.C. 2000).   The District of Columbia employs a "modified governmental interests analysis

which seeks to identify the jurisdiction with the most significant relationship to the dispute."   *Id.*;

---

[8]  This Court should also apply state law to determine whether Individual Defendants were acting within the scope
of their employment and if Kuwait is therefore vicariously liable for Plaintiff's TVPRA and 13th Amendment
claims.  *See First Nat'l City Bank*, 462 U.S. at 622 n11.

*see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. 2006); *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989). As part of this analysis, a court must consider the four factors enumerated in the Restatement (Second) of Conflict of Laws §145: "a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered." *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).

Applying these four factors, Maryland, not the District of Columbia, is the place with the most significant relationship to the dispute. The injuries at the center of Plaintiff's Complaint occurred in Maryland. Ms. Leo was residing in the home of the Individual Defendants in Bethesda, Maryland, when she was enslaved. All of Ms. Leo's claims are based on injuries that occurred while she and the Individual Defendants were residing in Maryland. While Kuwait maintains a diplomatic presence in the United States through its embassy in Washington D.C., this is the only factor in favor of the application of District of Columbia law to govern liability for these torts. As all the other factors require the application of Maryland law, it is Maryland law that governs the vicarious liability analysis.

 B. <u>Kuwait Is Vicariously Liable For the Individual Defendants' Tortious Conduct Because This Conduct Came Within The Scope Of the Kuwaiti Attaché's Employment.</u>

Kuwait argues that it cannot be held vicariously liable for the Individual Defendants' tortious acts because they did not further Kuwait's "business" and because Individual Defendants' unlawful acts were not foreseeable. Neither of these arguments, however, is supported under the applicable law of *respondeat superior* or by the facts Plaintiff has alleged. Under Maryland law:

> [A]n employee's tortious acts [are] within the scope of his
> employment [if they are] in furtherance of the employer's business
> and [are] "authorized" by the employer. … In addition, an
> important factor is whether the employee's conduct was
> "expectable" or "foreseeable."

*Sawyer v. Humphries,* 322 Md. 247, 255 (Md. 1991).  When taken as true, as they must be at this phase of the litigation, the factual allegations set forth in Plaintiff's complaint clearly establish that the tortious acts committed by Individual Defendants fell within the scope of their office or employment for Kuwait.

The first prong of the *Sawyer* test requires that the course of conduct in which the tortious act was committed must be performed with the intent to further the employer's interest.  Mr. Al Naser intended to serve the purpose of his employer, Kuwait, when he committed and/or authorized his wife Ms. Al Najadi, to commit the torts Plaintiff has alleged.  The Individual Defendants and Kuwait employed Ms. Leo as a domestic worker in order to assist Mr. Al Naser in running his diplomatic household and, after Ms. Leo entered the United States, subjugated her by taking her passport, imprisoning her in her workplace and compelling her to work through threats.  Ms. Leo's work ultimately inured to *Kuwait's* benefit.  The Kuwaiti Attaché was serving his employer Kuwait when he and his wife committed the tortious acts alleged by Plaintiff, and therefore, Kuwait is vicariously liable for their commission.

Plaintiff satisfies the second prong of the *Sawyer* test because the Kuwaiti Attaché's employment of Ms. Leo was "incident to the performance of the duties entrusted to him by" Kuwait—i.e., the business of diplomacy.  *Sawyer,* 322 Md. at 255 (quoting *Hopkins C. Co. v. Read Drug & C. Co.,* 124 Md. 210, 214 (Md. 1924)).  Kuwait authorized Ms. Leo's visa by verifying the Kuwaiti Attaché's diplomatic status and issuing a diplomatic note in support of the visa applications.  Without the visa, Ms. Leo would not have been permitted to enter the United

States and work for the Individual Defendants.  Moreover, the Individual Defendants'
employment of Ms. Leo was also naturally incident to and essential to the business of diplomacy.
The sole purpose of an A-3 visa is to permit diplomats to employ private housekeepers during
their assignments so that they can more effectively carry out their official functions.  Compl. ¶
43.

Regarding the third prong of the *Sawyer* test, this Court should give no consideration to
Kuwait's assertion that it is not liable for the Individual Defendants' tortious conduct because
their conduct was not foreseeable.  In so arguing, Kuwait wholly ignores Plaintiffs' well-pled
allegations to the contrary.  For example, Plaintiff has alleged that, as early as 1996, Kuwait
received a memorandum from the United States Department of State explaining that it was
concerned to learn that members of the diplomatic and consular community had paid their
personal household employees substantially less than those stipulated at the time of employment,
withheld their employees' passports, required employees to work for additional hours with no
additional pay, and forbade employees from leaving the employer's premises even when off
duty.  *See* Compl. ¶ 45.  The State Department further informed Kuwait that it should take
affirmative steps to monitor its employees, including reviewing employment contracts to ensure
that diplomats respect their obligations as employers.  *See* Compl. ¶ 46.  The letter explained that
the State Department would hold the "Chief of Mission and the sending government *responsible
for the conduct of persons sent to the United States as diplomatic representatives or of others
entitled to immunity*." *See* Compl. ¶ 47 (emphasis added).   On June 19, 2000, the State
Department sent yet another letter to Kuwait reminding them of diplomats' legal obligations to
their employee domestic workers.  *See* Compl. ¶ 49.  Further, Plaintiff has alleged that Kuwait
has ignored widespread evidence of physical and sexual abuse of domestic servants hired by

21

Kuwaiti nationals. "Employers physically abused foreign women working as domestic servants, and despite economic and social difficulties for a domestic servant who lodged a complaint, there were continuing reports of the rape of such women by male employees." Compl. ¶ 55; Bureau of Democracy, Human Rights and Labor, U.S. Department of State, Kuwait: *Country Reports on Human Rights Practices–2004*, http://www.state.gov/g/drl/rlse/hrrpt/2004/41725.htm. In light of Plaintiff's well-pled allegations, there is simply no basis for Kuwait to claim that the tortious acts of the Individual Defendants were not foreseeable.

Kuwait may also be held responsible for Defendant Ms. Al Najadi's tortious conduct because her acts formed part of the Individual Defendants' overall plan to traffic, subjugate, and otherwise exploit Plaintiff.[9] Kuwait ignores Plaintiff's allegations that the Mr. Al Naser approved of and ratified Ms. Al Najadi's day-to-day management of the household, including her abuse of Plaintiff. Compl. ¶ 3. Moreover, as Plaintiff has not yet taken any discovery, it is impossible to ascertain the degree of Mr. Al Naser's direction of and involvement in management of the household. Thus, it is premature at this juncture for this Court to conclude that Defendant Ms. Al Najadi's actions did not support Mr. Al Naser's diplomatic activities on behalf of Kuwait. *See Phoenix Consulting*, 216 F.3d at 40 (stating that if a defendant challenges the factual basis of a complaint, the court "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction").

---

[9]     It is well established under Maryland law that two people, such as the Kuwaiti Attaché and his wife here, engaged in a common scheme or enterprise are jointly liable for the wrongful acts they commit in furtherance of the joint venture. *See, e.g.*, *Consumer Protection Div. v. Morgan*, 387 Md. 125, 178-79 (Md. 2005) (noting that "when tortfeasors act independently and their acts combine to cause a single harm, the tortfeasors are jointly and severally liable"). Therefore, although Defendant Al Najadi is not an employee of the State of Kuwait, Kuwait may be held vicariously liable for her tortious conduct because she committed them in pursuance of a common scheme with her husband to subjugate and abuse Plaintiff.

## V.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS BECAUSE KUWAIT RATIFIED THE INDIVIDUAL DEFENDANTS' TORTIOUS ACTIONS.

Even if the Individual Defendants' tortious conduct is found to fall outside the scope of their office or employment, Kuwait can still be held directly liable because of its subsequent ratification of that conduct.  Ratification is defined as "the affirmance by a person (the Principal) of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."[10] RESTATEMENT (THIRD) OF AGENCY § 82 (2006); *see also Southern Mgmt. Corp. v. Taha,* 137 Md. App. 697, 719 (Md. Ct. Spec. App. 2001) (noting master is liable for acts of servant which master ratifies with knowledge of all material facts).

In this case, Ms. Leo alleges that Kuwait was fully aware of the Individual Defendants' involvement in her trafficking and forced labor and indeed that it knowingly facilitated both.  *See* Compl. ¶¶ 3, 64, 74.  It is undisputed that Kuwait authorized Mr. Al Naser to employ Ms. Leo as a domestic worker in the United States by verifying Mr. Al Naser's diplomatic status and issuing a diplomatic note in support of the visa applications.  Without the visa, Ms. Leo would not have been permitted to enter the United States and work for the Individual Defendants.  *See* Compl. ¶ 65.  Ms. Leo has further alleged that Kuwait was well aware of the pattern of mistreatment of domestic workers in Kuwait and, more specifically, of abuse of domestic workers by diplomatic personnel in the United States.  *See* Compl. ¶¶ 45-47, 55-57.  Moreover, the United States

---

[10] Again, the analysis does not change if this Court applies District of Columbia law to this case as ratification is also a viable theory of liability under this law as well.  District of Columbia law follows the RESTATEMENT (SECOND) OF AGENCY, which defines ratification as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act is given effect as if originally authorized by him." *Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666, 672 n12 (D.C. 1983) (quoting RESTATEMENT (SECOND) OF AGENCY § 82 (1958)).  Even if the agent is not authorized to do the act, the principal ratifies the act if it acquiesces to the agent's conduct or retains the benefits of the agents' act while the agent was in its service. *Id*. at 672; *see also Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 59-62, 69-72 (D.D.C. 2002) (recognizing that a foreign nation can ratify improper conduct by its ambassador).

government warned Kuwait that it was aware of instances where Kuwaiti diplomats had underpaid domestic workers; forced them to work substantially longer than agreed; withheld passports and forbid domestic staff to leave their home. *See* Compl. ¶ 45. Yet, at no time did Kuwait make any effort to ensure Plaintiff's safety or to monitor her employment situation, despite knowing based on widely documented evidence that Kuwaiti nationals often abuse their household employees. Compl. ¶ 48. Rather, Kuwait established a practice of refusing to monitor the working conditions of domestic servants hired by its agents and representatives.

Having thus adequately pled that Kuwait knowingly ratified the Individual Defendants' tortious conduct, Plaintiff has demonstrated that the non-commercial tort exemption applies to Plaintiff's claims, and that Kuwait is not entitled to immunity.

## VI.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS BECAUSE KUWAIT AIDED AND ABETTED THE TORTIOUS ACTIONS OF THE INDIVIDUAL DEFENDANTS.

Kuwait argues that Plaintiff has failed to allege that it directly engaged in any acts that would bring Plaintiff's claims within the purview of the non-commercial tort exception. Def.'s Br. at 6-12. Kuwait's argument, however, ignores Plaintiff's well pleaded allegations that Kuwait aided and abetted Individual Defendants' trafficking and forced labor of Plaintiff by knowingly providing Individual Defendants with substantial, practical assistance to carry out these unlawful acts. *See* Compl. ¶¶ 14, 43, 64, 74, 81.

### A.   Kuwait is Liable for Aiding and Abetting the Individual Defendants' Violation of the TVPRA

Aiding and abetting tortious conduct, a form of direct tort liability,[11] is a separate and

---

[11]   The Restatement (Second) of Torts, for example, makes this clear, noting that aiding and abetting a breach of duty "has the same effect upon the liability of the advisor as participation or physical assistance . . . the one [who aids and abets] . . . is himself a tortfeasor and is responsible for the consequences of the other's act." *Id.* § 876(b) cmt. d. *See e.g.*, *Am. Family Mut. Ins. Co. v. Grim*, 440 P.2d 621, 625 (Kan. 1968) ("One who aids, abets and encourages others in the commission of an unlawful act is guilty as a principal, and all are jointly and severally

independent basis for liability under the TVPRA.  To state an aiding and abetting claim, Ms. Leo needed to allege that:  (i) the Individual Defendants performed tortious acts that harmed her; (ii) Kuwait was generally aware of its role in the tortious conduct when it provided the assistance; and (iii) Kuwait knowingly and substantially assisted the Individual Defendants' tortious conduct.  *Halberstam v. Welch*, 705 F.2d at 477.  Ms. Leo has sufficiently pled these three elements.

As is required by the first part of the *Halberstam* test, Plaintiff alleges that the Individual Defendants committed wrongful and tortious acts that caused her injury: trafficking and forced labor.  *See* Compl. ¶¶ 10-39.  Plaintiff satisfies *Halberstam*'s second requirement because at the time that it provided the assistance, Kuwait: (a) knew that its personnel had engaged in severe acts of labor exploitation and turned a blind eye to such allegations, Compl. ¶¶ 45-47, 49, 51; (b) was in the possession of at least two communications from the United States Department of State detailing the widespread abuse of domestic workers by diplomatic personnel, Compl. ¶¶ 45-47, 49; and (c) knew that domestic workers, and South Asian women in particular, are treated much like indentured servants in Kuwait and that their principal traffickers are those who sponsor domestic workers.  Compl. ¶¶ 51, 54-56.  Finally, Plaintiff's allegations fulfill *Halberstam*'s third prong because Plaintiff alleges that Kuwait knowingly facilitated her trafficking and forced labor by authorizing her visa application.  Indeed, absent Kuwait's authorization and support, the United States would not have issued a visa to Ms. Leo, and Ms. Leo would not have been able to enter the United States with the Individual Defendants.  *See* Compl. ¶¶ 43-44, 50.

Because Kuwait knowingly provided substantial practical assistance to the Individual Defendants in subjecting Plaintiff to trafficking and forced labor, Kuwait aided and abetted the

---

liable in a civil action for any damages that may have resulted from their act."); *accord Halbertsam v. Welch*, 705 F.2d 472, 482-3 (D.C. Cir. 1983).

Individual Defendants' trafficking and forced labor violations under the TVPRA. And, because these claims come within the non-commercial tort exception, this Court has jurisdiction over Plaintiff's claims against Kuwait.

> B.   Kuwait Aided and Abetted Individual Defendant's State Law Torts Arising From their Trafficking and Forced Labor.

Kuwait also ignores Plaintiff's well-pled allegations that it is directly responsible for Plaintiff's injuries caused by her false imprisonment, intentional and negligent infliction of emotional harm and battery, by aiding and abetting the Individual Defendants to commit these state law torts. Compl. ¶¶ 134-35, 143, 151. All of Mr. Al Naser and Ms. Al Najadi's actions were committed in Maryland. Thus, under the FSIA, Maryland state law governs the nature and extent of a defendant's liability. *First Nat'l City Bank v. Banco Para El Camerio Exterior de Cuba*, 462 U.S. 611, 622 n11 (1983) ("[W]here state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances.").

The Maryland Court of Appeals has expressly recognized aider and abettor tort liability. *Alleco Inc. v. Harry & Jeanette Weinberg Found.,* 340 Md. 176, 199 (Md. 1995) (holding that a defendant is liable as a tortfeasor if it "by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Id*. (*quoting Duke v. Feldman,* 245 Md, 454, 457 (Md. 1967)). Plaintiff's allegations meet this standard, yet Kuwait simply fails to address aiding and abetting as an alternative basis for its liability for Plaintiff's state law tort claims. *See* Compl. ¶¶ 126, 134. Kuwait has therefore failed to satisfy its burden to demonstrate that the non-commercial tort exception to immunity does not apply, and this Court has jurisdiction over Plaintiff's claims.

**VII.  KUWAIT'S KNOWING PARTICIPATION IN THE INDIVIDUAL
DEFENDANTS' TORTIOUS ACTIONS AGAINST PLAINTIFF ARE NOT
"DISCRETIONARY FUNCTIONS" THAT SHOULD BE PROTECTED BY
IMMUNITY.**

Kuwait mistakenly argues that its wrongful activity qualifies as a "discretionary

function."  Under the FSIA, the tort exception does not apply to "any claim based upon the

exercise or performance or the failure to exercise or perform a discretionary function regardless

of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  Kuwait's participation in the

torts against Ms. Leo, however, cannot be termed a "discretionary function" for several reasons.

First, a foreign sovereign has no discretion to perpetrate or "to aid in" conduct that is

"clearly contrary to the precepts of humanity as recognized in both national and international

law."  *De Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980).  Here, Kuwait's

actions aided the Individual Defendants' enslavement of Ms. Leo, conduct that plainly

contravenes national and international law prohibiting involuntary servitude, slavery, and

slavery-like practices.  *See, e.g.,* Slavery, Servitude, Forced Labour and Similar Institutions and

Practices Convention of 1926, Mar. 9, 1927, 60 L.N.T.S. 253, 212 U.N.T.S. 17; Int'l Covenant

on Civil and Political Rights art 8, Dec. 16, 1966, 999 U.N.T.S. 17; Universal Decl. of Human

Rights art. 4, Dec. 10, 1948, G.A. res. 217(A)(II), U.N. Doc. 1/8107; U.S. Const. amend. XIII.

Accordingly, Kuwait can not have exercised a "discretionary function" in aiding in Ms. Leo's

trafficking and enslavement.  *Letelier*, 488 F. Supp. at 673 (parenthetical).

Second, a foreign sovereign has no discretion to commit acts that contravene the laws and

regulations of the receiving state.  VCDR art. 41(1) (SPA 62); *United States v. Gaubert*, 499 U.S.

315, 324 (1991).  United States and international law clearly prohibit trafficking, forced labor,

involuntary servitude and false imprisonment,[12] the claims at issue here.

---

[12] Likewise, Article 185 of Kuwait's criminal code prohibits international trafficking.  *See* The State Department,

Third, Kuwait's acts are not of the type that the discretionary function exception is designed to shield.  The discretionary function only extends immunity if "the discretionary acts of a government employee are of the nature and quality that Congress intended to shield from tort liability." *Maalouf*, 208 F. Supp. 2d at 35-36 (internal citations and quotes omitted).  The exception "protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323; *see also Maalouf*, 208 F. Supp. 2d at 36-37 (noting that the discretionary function exception applies to "broader considerations of budgetary constraints, security concerns, [or] political concerns regarding the image the foreign government wishes to project").  Kuwait's conduct alleged in the present case was not based on "on considerations of public policy."  Indeed, the trafficking of Plaintiff was "not a result of any policy-making duties of a governmental body" and thus does not trigger the immunity provided by the "discretionary function" exception.  *Id.* at 36 (parenthetical).

Finally, under the FSIA, the foreign state, not the plaintiff, bears the burden of proving by a preponderance of the evidence that the discretionary function exception applies.  *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 35 (D.D.C. 2002).  As set forth above, Kuwait has failed to meet its burden.

**VIII.   PLAINTIFF'S CLAIM OF FALSE IMPRISONMENT, AS WELL AS HER CLAIMS OTHER THAN FRAUD AND CONSTRUCTIVE FRAUD, COME WITHIN THE NON-COMMERCIAL TORT EXCEPTION TO IMMUNITY UNDER THE FSIA BECAUSE THESE CLAIMS DO NOT ARISE OUT OF DECEIT OR MISREPRESENTATION.**

The non-commercial tort exception does not allow this Court jurisdiction over claims arising out of misrepresentation or deceit, *see* 28 U.S.C. § 1605(a)(5)(B), and, accordingly, Ms.

---

2007 Trafficking in Persons Report, p. 107.  The Ninth Circuit has held that the discretionary function exception is inapplicable when an employee of a foreign government violates its own internal law.  *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (citations omitted).

Leo's claims for fraud or constructive fraud are not cognizable under this exception.[13]   However,

the non-commercial tort exception abrogates Kuwait's immunity for Plaintiff's false

imprisonment, as well as for her other non-fraud claims, because they do not arise out of deceit

or misrepresentation.   The essential elements of Ms. Leo's false imprisonment claims are the

Individual Defendants' confinement of Ms. Leo in their home against her will.   *State v. Dett*, 391

Md. 81, 92 (Md. 2006) (defining false imprisonment as "deprivation of the liberty of another

without his consent and without legal justification") (internal citation omitted).   Thus,

misstatements are not essential for Ms. Leo to prevail on this claim, and accordingly, this Court

has jurisdiction over these claims.   *Travel Assoc., Inc. v. Kingdom of Swaz.*, Civil Action No. 89-

1235, 1990 U.S. Dist. LEXIS 11455, at *6 (D.D.C. Aug. 29, 1990) (*citing Block v. Neal*, 460

U.S. 289, 296-98 (1983)); *see also Kohn v. United States*, 680 F.2d 922, 926 (2d Cir. 1982)

(holding that the exceptions for misrepresentation and deceit "have generally been applied only

to actions for damages due to commercial decisions that were predicated on incorrect or

incomplete information").   Indeed, the Ninth Circuit has noted that the FSIA's non-commercial

tort exception allows claims against foreign states for false imprisonment.   *See Blaxland v.*

*Commw. Dir. of Public Prosecutions*, 323 F.3d 1198, 1203 (9th Cir. 2003) ("Section

1605(a)(5)(B) does not, however, exclude claims for false imprisonment from the 1605(a)(5) tort

exemption").

In an attempt to repackage Plaintiff's false imprisonment claim as a claim based upon

"deceit and misrepresentation," Kuwait argues that "the core allegation supporting that claim is

that the Individual Defendants used threats and coercion to make her "believe[] that she was

confined within the Individual Defendants' home."   Def.'s Br. at p. 13.   This not only

---

[13] Plaintiff brings her claims for fraud or constructive fraud against Kuwait under the commercial activity exception
to foreign sovereign immunity, as these claims are based on a "commercial activity"—Plaintiff's employment.

mischaracterizes Ms. Leo's allegations, but it also cherry-picks language from the very paragraph it purports to quote. The relevant paragraph states: "Plaintiff reasonably believed that she was confined within the Individual Defendants' home *as a result of the Individual Defendants' coercion, use of force and threats of force*." Compl. ¶ 132 (emphasis added). There is no mention of deceit or misrepresentation. Rather, the Complaint alleges that Ms. Leo believed that she was confined in Individual Defendants' home because she was physically assaulted, threatened with death and severe bodily injury, kept penniless, deprived of her passport and other legal papers and completely isolated from the outside world. Compl. ¶¶ 16, 22-39. Ms. Leo's imprisonment resulted not from misrepresentation but from real physical and psychological abuse on the part of the Individual Defendants. Thus, with the exception of their claims of fraud or constructive fraud, all of Plaintiff's claims fall within the commercial tort exception to the FSIA.

## CONCLUSION

Plaintiff respectfully requests that the Court reconsider its November 23, 2009 Order, and, for the foregoing reasons, the Court deny Defendant the State of Kuwait's Motion to Dismiss in its entirety.

Respectfully submitted,

/s/ Guy S. Neal

COUNSEL FOR REGINA M. LEO
Guy S. Neal (DC Bar No. 441748)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 736-8041
E-mail: gneal@sidley.com

Dated: December 3, 2010

30

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2010, I electronically filed the foregoing Memorandum of Law in Support of Plaintiff's Motion for Relief Upon Reconsideration of the Court's November 23, 2009 Order, and accompanying Exhibits, using the ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Guy S. Neal_____
COUNSEL FOR REGINA M. LEO